IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, | **MEMORANDUM DECISION AND ORDER DENYING MOTION TO SUPPRESS** |
| Plaintiff, | |
| v. | Case No. 1:17-cr-00084-RJS-DBP |
| DARRELL WASHINGTON, | Chief District Judge Robert J. Shelby |
| Defendant. | Chief Magistrate Judge Dustin B. Pead |

Now before the court is Defendant Darrell Washington's Motion to Suppress.[1]  For the reasons explained below, the Motion is DENIED.

## BACKGROUND

In 2017, the Bureau of Alcohol, Tobacco, Firearms and Explosives initiated a narcotics investigation in Ogden, Utah.[2]  As part of this operation, ATF agents investigated Washington and conducted several successful and unsuccessful controlled narcotics purchases with him, as detailed below:

1.  A July 13, 2017 controlled purchase of $400 of crack cocaine from Washington;
2.  A July 17, 2017 controlled discussion between a confidential informant (C.I.) and Washington about purchasing crack cocaine, during which Washington provided the C.I. with his cell phone number;
3.  A July 19, 2017 controlled purchase of $660 of crack cocaine from Washington;
4.  An August 3, 2017 attempted controlled purchase of crack cocaine from Washington;
5.  An August 4, 2017 attempted controlled purchase of crack cocaine from Washington;
6.  An August 22, 2017 attempted controlled purchase of crack cocaine from Washington;
7.  A September 14, 2017 controlled purchase of 2 grams of heroin from another suspect near Washington's residence and with the target phoning Washington several times during the transaction.[3]

---

[1] Dkt. 121 (Motion to Suppress); Dkt. 242 (Memorandum in Support of Motion to Suppress).

[2] *See* Dkt. 242-2 (Exhibit B: Wiretap Affidavit) ¶ 12.

[3] *Id.* ¶¶ 13–60, 62.

In the midst of this investigation, on August 2, 2017, the United States sought a court order to obtain historical cell site location information (CSLI) for Washington's cell phone number dating from July 1, 2017, as well as a pen register and trap and trace device to capture ingoing and outgoing calls.[4]  The request for the court order detailed the July 13 and July 19 controlled purchases, as well as the July 17 controlled discussion.[5]  The same day, then-Magistrate Judge Robert T. Braithwaite issued an Order finding specific and articulable facts showing reasonable grounds to believe CSLI was relevant and material to the ongoing criminal investigation, and accordingly directed Washington's mobile phone carrier, pursuant to 18 U.S.C. § 2703, to provide CSLI data for the target phone number from July 1, 2017 through the date of the order.[6]

On October 4, 2017, the agents sought authorization to wiretap Washington's phone.[7] The affidavit in support of the application for the wiretap (the Affidavit) detailed the successful and attempted controlled purchases, physical surveillance, data gained from the pen register and trap and trace device, and CSLI data.[8]  The application was granted and agents began to intercept phone calls between Washington and others.  On November 3, 2017, agents sought and received a second authorization order to continue monitoring Washington's cellphone.[9]  During the period

---

[4] Dkt. 242-1 (Exhibit A: Pen Register Order) at 2–3, 10–11.  A pen register is a device which records dialing information transmitted from a particular phone number.  *See* 18 U.S.C. § 3127(3).  A trap and trace device correspondingly captures incoming phone calls to a particular phone number.  *See id.* § 3127(4).  Cell site location information (CSLI) identifies the cell towers to which a cell phone connects at certain times, typically the beginning or end of a phone call.  CSLI records therefore approximate the cell phone's location.  *See* Dkt. 253 (Memorandum in Opposition to Motion to Suppress) at 14–16 (defining terms).

[5] *See* Exhibit A: Pen Register Order at 7–10.

[6] *Id.* at 15–17.  Judge Braithwaite also approved the use of a pen register and trap and trace device.  *Id.*

[7] *See* Exhibit B: Wiretap Affidavit ¶ 110.  Washington mistakenly states this occurred on August 13, 2017.  *See* Memorandum in Support at 17.

[8] *See* Exhibit B: Wiretap Affidavit ¶¶ 13–100.

[9] Memorandum in Opposition to Motion to Suppress at 5.

of wiretap surveillance, which lasted until late November, agents intercepted "thousands" of phone calls between Washington and others, in which he discussed "more than a hundred narcotics transactions involving heroin, marijuana, cocaine, and methamphetamine."[10] Additionally, the agents "observed dozens of suspected narcotics transactions and conducted wall stops to confirm Washington was selling narcotics during the wiretap period."[11]

In late November 2017, the United States presented a Complaint and arrest warrants to a magistrate judge.[12] After being arrested and receiving *Miranda* warnings, Washington agreed to speak to the agents and confessed to buying and selling narcotics.[13]

## PROCEDURAL HISTORY

On November 30, 2017, Washington appeared before then-Magistrate Judge Brooke C. Wells for an initial appearance and detention hearing.[14] During the hearing, Washington entered a plea of not guilty, Benjamin C. McMurray was appointed as his counsel, and Washington submitted to detention.[15]

On December 13, 2017, the Grand Jury returned an indictment charging Washington with the following counts:

- Count 1: Conspiracy to Distribute Cocaine Base, 21 U.S.C. § 841(A)(1), 846
- Count 2: Conspiracy to Distribute Heroin, 21 U.S.C. § 841(A)(1), 846
- Count 3: Possession of Cocaine Base with Intent to Distribute, 21 U.S.C. § 841(A)(1) and 18 U.S.C. § 2

---

[10] *Id.*

[11] *Id.*

[12] *See* Dkt. 1 (Sealed Complaint). The United States notes that the Complaint does not discuss any evidence from the wiretap in order to demonstrate probable cause for Washington's arrest. Opposition at 6.

[13] Memorandum in Opposition at 6 ("Among other statements, Washington stated that he bought 5 ounces of cocaine at a time and made about $4,000 a month selling narcotics. He further acknowledged selling both heroin and crack. Finally, he stated that he would take the blame for the narcotics and the firearms agents had recovered in this case to protect several of the other co-defendants.").

[14] Dkt. 5 (Minute Entry).

[15] *Id.*

- Count 4: Possession of Heroin with Intent to Distribute, 21 U.S.C. § 841(A)(1) and 18 U.S.C. § 2
- Counts 5 and 6: Distribution of Cocaine Base, 21 U.S.C. § 841(A)(1)
- Count 7: Possession of Heroin with Intent to Distribute, 21 U.S.C. § 841(A)(1) and 18 U.S.C. § 2
- Count 9: Using and Carrying a Firearm During and In Relation to a Drug Trafficking Offense, 18 § 924(c)(1)(A) and 18 U.S.C. § 2.[16]

During a subsequent arraignment hearing before then-Magistrate Judge Evelyn Furse on December 14, 2017, Washington again entered a plea of not guilty.[17]  On December 15, 2017, Judge Dee Benson was assigned to the case.[18]  In 2018, the case was continued several times on the motions of both parties, due to the need to review voluminous discovery and adjudicate other Co-Defendants' motions.[19]

On January 7, 2019, Washington filed a Motion to Compel the government to disclose the identity of its confidential informant (C.I.).[20]  After receiving Opposition from the United States,[21] Judge Benson granted the Motion to Compel on February 5, 2019 and ordered the government to disclose the C.I.'s name to Washington's defense counsel.[22]

On April 29, 2019, Washington filed the currently pending Motion to Suppress.[23]  In it, he argued that the officers' trap and trace order went "far beyond a traditional trap and trace,

---

[16] Dkt. 8 (Sealed Indictment).  Veldawn Norrise was charged with Counts 1–4 and Count 8 (Using and Carrying a Firearm During and in Relation to a Drug Trafficking Crime, 18 U.S.C. § 924(c)), Autumn Larsen was charged with Count 2 and Count 7, and Lamont Hooks was charged with Count 10 (Felon in Possession of a Firearm, 18 U.S.C. § 922(g)(1)).  *See id.*  The case was unsealed on January 23, 2018.  Dkt. 24 (Order Granting Motion to Unseal Case).

[17] Dkt. 18 (Minute Entry).

[18] Dkt. 19 (Order of Recusal).

[19] *See, e.g.*, Dkt. 51 (United States' Motion to Continue) at 1–3 (summarizing procedural history).

[20] Dkt. 87 (Motion to Compel).

[21] Dkt. 91 (Memorandum in Opposition to Motion to Compel).

[22] Dkt. 100 (Order and Memorandum Decision Granting Motion to Compel).

[23] Dkt. 121 (Motion to Suppress).  Washington had previously moved to extend the motion deadline, Dkt. 116 (Motion for Extension of Time), and Judge Benson granted that Motion, Dkt. 117 (Order Granting Motion for Extension).

seeking historical cellphone location data from more than a month in the past," and that it appeared officers began tracking Washington's location from his phone, despite no warrant being issued to support "either the issuance of historical location data or active location tracking."[24]  Washington further argued that officers made limited efforts to physically surveil him after obtaining the trap and trace order, but instead relied on wiretap warrants.[25] Accordingly, Washington asked the court to suppress "all evidence seized as a result of obtaining his location using cellphone data and all evidence seized pursuant to the wiretaps."[26] Washington identified the issues raised by the Motion to Suppress as follows:

1. Whether historical cellphone records obtained without a warrant violated the Fourth Amendment;
2. Whether the tracking of Washington's location using cellphone data without a warrant violated the Fourth Amendment;
3. Whether the officers violated Title III when a wiretap warrant was obtained without first resorting to other investigative techniques; and
4. Whether evidence stored at the Weber County Evidence Room should be excluded, because an evidence technician there had been found guilty of evidence tampering.[27]

On July 10, 2019, an evidentiary hearing was held on the Motion to Suppress.[28]  The government called Special Agent Tyler Olson as a witness, and testimony was taken regarding the investigation of Washington.[29]  First, the United States took testimony related to the first two issues Washington had identified: the historical cell phone location data and tracking of Washington's location.[30]  Agent Olson testified that based on the CSLI data, the agents could not

---

[24] Motion to Suppress at 2.

[25] *Id.*

[26] *Id.*

[27] *Id.* at 2–3.

[28] Dkt. 137 (Minute Entry).

[29] *See* Dkt. 253-1 (Exhibit 1: First Evidentiary Hearing Transcript).

[30] *Id.* at 10:9–22:16.

determine the location of Washington's phone "with any precision,"[31] and information from the pen register as to the location was also not "precise."[32]  He further testified that the reference to "cell phone GPS location information" in the Affidavit[33] referred to pen register information, as opposed to some other, more detailed tracking technology.[34]  Agent Olson testified that the word "ping" used in the Affidavit referred to the general location of cell towers, not "actual physical cell phone location data."[35]  As to the third issue, the United States declined to take testimony because the analysis of a potential Title III violation is based on the four corners of the affidavit supporting a wiretap.[36]  And regarding the fourth issue, the United States' testimony of Agent Olson indicated no evidence was brought to the Weber County evidence room; instead, it was taken to the Ogden Police Department.[37]  Counsel for Washington cross-examined Agent Olson on all four issues but called no additional witnesses.[38]

On August 21, 2019, Sharon L. Preston entered an appearance on behalf of Washington.[39]  On August 23, 2019, McMurray filed a Motion to Withdraw as Washington's

---

[31] *Id.* at 17:18–19:23.

[32] *Id.*

[33] Exhibit B: Wiretap Affidavit ¶ 97.

[34] Exhibit 1: First Evidentiary Hearing Transcript at 20:6–22:16.

[35] *Id.*

[36] *Id.* at 22:17–23:6.

[37] *Id.* at 23:8–24:17.

[38] *Id.* 25:15–50:4.  Washington's questioning focused on whether the agents could have arrested Washington at earlier junctures, for example during the July 13, 2017 controlled purchase, *id.* at 25:24–28:20, whether the requested historical CSLI data and pen register data could aid in location tracking, *id.* at 30:18–36:3, and the accuracy of location data from "pinging" a cell tower, *id.* at 36:4–39:20.

[39] Dkt. 140 (Notice of Attorney Appearance).

Attorney, as Washington no longer needed court-appointed counsel.[40]  Judge Benson granted that Motion on August 26, 2019.[41]

Judge Benson set a briefing schedule for the Motion to Suppress in advance of a February 26, 2020 hearing for argument,[42] but Washington filed several motions to extend the briefing deadlines, which delayed the hearing date.[43]  On May 21, 2020, Washington filed a Motion to reopen the evidentiary hearing.[44]  In that Motion, Washington stated he needed to take testimony from an expert witness, as well as additional testimony from Agent Olson.[45]

The above-captioned case was reassigned to the undersigned on December 8, 2020, following Judge Benson's passing.[46]  During a February 10, 2021 status conference, the court granted the Motion to reopen the evidentiary hearing, and directed counsel to decide whether they preferred an earlier, remote hearing or a later, in-person hearing.[47]  During an April 21, 2021 status conference, the parties expressed their preference for an earlier, remote hearing, which was scheduled for June 24, 2021.  In response to a request from Washington's counsel to be able to provide the court with additional briefing on legal authority to guide questioning of

---

[40] Dkt. 142 (Motion to Withdraw).

[41] Dkt. 144 (Order Granting Motion to Withdraw).

[42] Dkt. 179 (Order re: Briefing Schedule).

[43] On January 22, 2020, Washington filed a "Final Motion for Extension of Time" to extend the motion-filing deadline.  Dkt. 182.  Judge Benson granted that Motion on January 23, 2020, extending the deadline for motions to March 22, 2020.  Dkt. 184 (Order).  On February 24, 2020, Washington filed a Motion to Continue the Hearing on the Motion to Suppress.  Dkt. 187 (Motion to Continue).  Judge Benson granted that Motion on February 25, 2020, resetting the hearing for April 27, 2020.  Dkt. 188 (Order).  On March 25, 2020, Washington filed another Motion to extend both the motion deadline and to continue the motion hearing.  Dkt. 190 (Motion for Extension of Time).  Judge Benson granted that Motion on April 7, 2020, resetting the hearing for June 18, 2020, and extending the motion deadline to May 22, 2020.  Dkt. 191 (Order).

[44] Dkt. 192 (Motion to Reopen Evidentiary Hearing).

[45] *Id.* at 1–2.

[46] Dkt. 204 (Docket Text Entry).

[47] Dkt. 207 (Minute Entry).  The availability of in-person hearings was limited in early 2021 due the court's general orders entered in response to the ongoing COVID-19 pandemic.  *See, e.g.*, General Order 20-011.

witnesses during the evidentiary hearing, the court set a deadline for additional briefing to be submitted two weeks before the hearing.[48]  That evidentiary hearing was later reset to August 3, 2021.[49]  On July 29, 2021, Washington filed the additional briefing, which framed the issues to be addressed as follows:

1. Whether the agents improperly used location tracking technology—namely a cell site simulator—without a warrant, in violation of the Fourth Amendment; and
2. Whether the agents improperly obtained historical cell location data without a warrant.[50]

These issues roughly mirrored the first two articulated in Washington's initial Motion to Suppress, though with a more specific theory as to the type of location tracking used.  The third and fourth issues identified in the original Motion to Suppress—concerning the application for the wiretap and the evidence room—were absent from the briefing.

On August 3, 2021, the court held the second evidentiary hearing.[51]  Testimony was again taken from Agent Olson, along with Washington's expert, Ben Levitan.[52]  Agent Olson again testified about the relative accuracy of location tracking that could be revealed from "pinging" cell phone towers, as well as what "pinging" meant in context of the Affidavit supporting the application for the wiretap at issue.[53]  The United States proffered that historical CSLI data had been obtained during the investigation pursuant to the applicable court order.[54]  Levitan testified about the total area a cell phone tower can cover, a sector of 9.4 square miles, and opined this was not sufficiently narrow to support the statement in the Affidavit that

---

[48] Dkt. 219 (Minute Entry).

[49] Dkt. 223 (Amended Notice of Zoom Evidentiary Hearing).

[50] Dkt. 224 (Pretrial Memorandum) at 1–4.

[51] Dkt. 225 (Minute Entry).

[52] *See* Dkt. 253-2 (Exhibit 2: Second Evidentiary Hearing Transcript).

[53] *Id.* at 13:19 – 28:17.

[54] *Id.* at 8:12–18.

"Washington was pinging in the area" of an Ogden park.[55]  Levitan testified that based on this, his opinion was that law enforcement "used its own equipment" in addition to the pen register, likely a cell-site simulator, to obtain more precise location information.[56]  A cell-site simulator, Levitan explained, is a mobile device that acts as a cell phone tower, which law enforcement can use to pinpoint the location of cell phones with more accuracy than stationary cell towers.[57]

At the close of the hearing, the court directed Washington to file a brief in support of the Motion to Suppress within two weeks of receiving the official transcript of the evidentiary hearing.[58]  Following several delays,[59] Washington's Memorandum in Support of the Motion to Suppress was filed October 12, 2021.[60]  The United States filed a Motion to Continue its response on November 23, 2021.[61]  The court granted that Motion, setting the United States' response deadline for December 3, 2021, and Washington's reply brief for December 17, 2021.[62]  A hearing on the Motion to Suppress was set for January 7, 2022.[63]  The United States filed its Memorandum in Opposition on December 3, 2021.[64]  On December 30, 2021, Washington filed

---

[55] *Id.* at 38:7–52:9.

[56] *Id.* 46:3–49:19.  Levitan's expert report came to the same conclusion.  *See* Dkt. 242-3 (Exhibit C: Telephone Expert Report).

[57] Exhibit 2: Second Evidentiary Hearing Transcript at 48:6–50:10.

[58] *Id.* 63:1–14; *see also* Dkt. 225 (Minute Entry).  A hearing for argument was set for September 21, 2021.  *See* Dkt. 229 (Notice of Hearing).

[59] On August 20, 2021, Washington filed a Motion for Extension of Time to file the brief in support, Dkt. 230, which the court granted, extending the deadline to September 22, 2021, Dkt. 232.  On September 23, 2021, Washington filed another Motion to Extend.  Dkt. 236.  The court granted that Motion as well, extending the deadline to October 4, 2021.  Dkt. 238.  Washington filed his Memorandum in Support of the Motion to Suppress one week past the deadline, on October 12, 2021, along with Motion for Leave to file out of time, Dkt. 243, which the court granted, Dkt. 245.

[60] *See* Memorandum in Support.

[61] Dkt. 249 (Plaintiff's Motion to Continue).

[62] Dkt. 251 (Order Granting Motion to Continue).

[63] Dkt. 252 (Notice of Hearing).

[64] Dkt. 253 (Memorandum in Opposition to Motion to Suppress).

a Stipulated Motion for Extension of Time for his reply.[65]  The court granted that Motion, setting the deadline for Washington's Reply in support of the Motion to Suppress for January 30, 2022.[66]  The hearing was reset for February 22, 2022.[67]

Washington never filed a reply memorandum.  On February 22, 2022, the court heard oral argument on the Motion to Suppress.[68]  The Motion is now ripe for review.

## LEGAL STANDARD

The Fourth Amendment protects the public from "unreasonable searches and seizures."[69] For a search and seizure to be lawful, authorities must first obtain a warrant based on probable cause,[70] unless one of the many exceptions to the warrant requirement applies.[71]  Evidence seized in violation of the Fourth Amendment is precluded from admission under the exclusionary rule,[72] which excludes "both the primary evidence obtained as a direct result of an illegal search or seizure," as well as "evidence later discovered and found to be derivative of an illegality, the so-called fruit of the poisonous tree."[73]  In determining whether a violation has occurred, the "ultimate touchstone of the Fourth Amendment is reasonableness."[74]

---

[65] Dkt. 254 (Motion for Extension of Time).

[66] Dkt. 255 (Docket Text Order).

[67] Dkt. 256 (Amended Notice of Hearing).

[68] Dkt. 259 (Minute Entry).

[69] U.S. Const. amend IV.

[70] *See, e.g.*, *Terry v. Ohio*, 392 U.S. 1, 20 (1968) (citations omitted).

[71] *See Coolidge v. New Hampshire*, 403 U.S. 443, 454–55 (1971).

[72] *Mapp v. Ohio*, 367 U.S. 643, 648 (1961).

[73] *Utah v. Strieff*, 579 U.S. 232, 237 (2016) (citation omitted).

[74] *United States v. Metts*, 748 F. App'x 785, 788 (10th Cir. 2018) (unpublished) (quoting *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006)).

"[T]he defendant bears the burden of proving whether and when the Fourth Amendment was implicated,"[75] and "[t]he government then bears the burden of proving that its warrantless actions were justified [by an exception to the warrant requirement]."[76]  If the government establishes that an exception to the warrant requirement applies, the action is deemed constitutional.[77]

## ANALYSIS

First, the court addresses the threshold issue of standing.  Second, the court analyzes Washington's arguments concerning the United States' warrantless acquisition of CSLI data. Third and finally, the court addresses Washington's argument that the United States used a cell site simulator without a warrant.

### I.     Washington Has Standing to Bring a Fourth Amendment Challenge

To seek suppression of evidence proffered against him, a defendant must show that his own Fourth Amendment rights were violated.[78]  While Washington briefly argued he has standing in the initial Motion to Suppress,[79] he did not argue for standing in the Memorandum in Support.[80]  Nonetheless, the United States concedes in its Opposition that Washington, as the user of the target telephone at issue, has standing to bring this Fourth Amendment challenge to the acquisition of the phone's CSLI data.[81]  The court agrees.

---

[75] *United States v. Neugin*, 958 F.3d 924, 930 (10th Cir. 2020) (quoting *United States v. Hernandez*, 847 F.3d 1257, 1263 (10th Cir. 2017)).

[76] *Id.* (quoting *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994)).

[77] *Id.* (citing *United States v. Maestas*, 2 F.3d 1485, 1491–92 (10th Cir. 1993)).

[78] *Minnesota v. Carter*, 525 U.S. 83, 88 (1998).

[79] Motion to Suppress at 3.

[80] *See generally* Memorandum in Support.

[81] Memorandum in Opposition at 14.

## II.   The Warrantless Acquisition of Washington's CSLI Data Pursuant to § 2703(d) was Justified Under the Good-Faith Exception to the Warrant Requirement

Washington's first argument is that due to the 2018 Supreme Court case *Carpenter vs. United States*,[82] the Cell Site Location Information (CSLI) agents obtained in his case, pursuant to a court order but without a warrant, must be suppressed, along with all evidence derived from it.[83]   *Carpenter*'s holding applies only to historical CSLI data; the court left open the question of whether real-time CSLI data-gathering constitutes a search.[84]   Washington contends that both historical and real-time CSLI data the agents gathered in his case must be suppressed, arguing that this court should expand *Carpenter*'s holding to real-time CSLI, as a few out-of-circuit district courts have done.[85]

In Opposition, the United States concedes historical CSLI data on Washington was gathered pursuant to a court order and without a warrant.[86]   But the United States argues that because the historical CSLI data was gathered in 2017, almost a full year before the *Carpenter* decision, the good-faith exception to the warrant requirement applies: that is, the law enforcement agents acted under a good-faith belief that the court order was constitutionally obtained pursuant to then-existing law.   For this reason, the United States asserts the evidence should not be suppressed.[87]   In the alternative, the United States argues that even if the CSLI data

---

[82] 138 S. Ct. 2206, 2217 (2018) (holding that historical cell site location information (CSLI) obtained pursuant to a court order constitutes a search, and thus violates the Fourth Amendment if obtained without a warrant).

[83] Memorandum in Support at 8–11.

[84] *Carpenter*, 138 S. Ct. at 2220.

[85] *See* Memorandum in Support at 11–14 (collecting cases).

[86] Memorandum in Opposition at 9.  Because historical CSLI data falls directly under *Carpenter*'s holding, whereas real-time CSLI data does not, the United States' concession somewhat simplifies the issues brought forth by Washington's argument because an expansion of *Carpenter*'s holding is not necessary to resolve whether the CSLI data gathered in this case falls under the ambit of *Carpenter*.  Nevertheless, because the court concludes the good-faith exception to the warrant requirement applies to the gathering of CSLI data in this case, as discussed more fully below, it is unnecessary to address whether real-time CLSI data should be suppressed under *Carpenter*.

[87] *Id.* at 17–29.

is suppressed, the Affidavit would still provide probable cause for the wiretap due to other evidence it details, and therefore, the evidence gained from the subsequent wiretaps should not be suppressed.[88]

At oral argument, Washington conceded "there is a strong argument the good-faith exception to the warrant requirement would apply," but argued that because the cases cited by the United States deal with historical CSLI data, and this case "involved live tracking which was not addressed by any of the cases," the good-faith exception does not apply.[89]

In short, the parties agree that under *Carpenter*, acquiring Washington's historical CSLI data was an unconstitutional search under the Fourth Amendment because the government did not first obtain a warrant supported by probable cause. The issue is whether the good-faith exception applies to block the application of the exclusionary rule, and whether the potential acquisition of real-time CSLI as opposed to historical CSLI changes the analysis. The court agrees with the United States that the good-faith exception applies and disagrees with Washington that the acquisition of real-time CSLI would compel a different conclusion. Accordingly, the evidence will not be suppressed.

Under the good-faith exception to the warrant requirement as announced in *United States v. Leon*,[90] the Fourth Amendment exclusionary rule is not applied to bar the use of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate when the warrant is ultimately found to be invalid.[91] The *Leon* court reasoned

---

[88] *Id.* at 29–34. The United States also argues that if the wiretap evidence is suppressed, the attenuation doctrine would not necessitate the suppression of non-wiretap evidence, including Washington's post-*Miranda* confession. *Id.* at 34–36. Because the court concludes the evidence should not be suppressed, it is not necessary to address this argument.

[89] *See* Dkt. 259 (Minute Entry for Hearing re: Motion to Suppress).

[90] 468 U.S. 897 (1984).

[91] *Id.* at 922. This exception differs from other exceptions to the warrant requirement in that other exceptions find certain types of warrantless searches reasonable and therefore not violations of the Fourth Amendment requiring

that because the central goal of the suppression remedy is to deter future misconduct by law enforcement,[92] and only "marginal or nonexistent" deterrent effect would attach when evidence was suppressed that was gained by an officer's objectively reasonable reliance on a subsequently invalidated search warrant, suppression would be inappropriate unless the judge was misled in the affidavit supporting the warrant or the warrant was so "facially deficient" that the executing officers could not reasonably presume it to be valid.[93]  In *Illinois v. Krull*, the Supreme Court held this good-faith exception applied when a warrantless search was conducted in "objectively reasonable reliance upon a statute authorizing [such] searches," even when the statute was later found to have violated the Fourth Amendment.[94]  The Supreme Court further held in *Davis v. United States* that the good-faith exception applies when officers conduct a search in objectively reasonable reliance on binding judicial precedent, including that of the Courts of Appeal.[95]

In 2017, when the ATF agents obtained a court order to access Washington's CSLI, the Stored Communications Act (SCA) authorized the government to "require a provider of electronic communication service . . . to disclose a record or other information pertaining to a customer or subscriber of such service" by "obtain[ing] a court order for such disclosure" under 18 U.S.C. § 2703(d).[96]  Prior to *Carpenter*, every United States Court of Appeals to consider the issue, including the Tenth Circuit, held the acquisition of CSLI data via a court order pursuant to

---

suppression.  The good-faith exception applies when a court determines a warrantless search has occurred but concludes suppression is not appropriate because it does not serve a deterrent effect.  *See id.*

[92] *Id.* at 919–920.

[93] *Id.* at 922–23.

[94] 480 U.S. 340, 349–50 (1987).

[95] 564 U.S. 229, 241 (2011).

[96] 18 U.S.C. § 2703(c)(1)(B).

the SCA was constitutional.[97]  In particular, the Tenth Circuit reasoned that cell phone users

"lack a reasonable expectation of privacy in their historical CSLI, which users voluntarily

convey to third-party cell-service providers," and accordingly upheld an order granting the

government's application for orders requesting CSLI pursuant to § 2703(d).[98]  In reaching this

conclusion, the Tenth Circuit—like every circuit before it—relied on *United States v. Miller*[99]

and *Smith v. Maryland*,[100] two Supreme Court cases which held no Fourth Amendment search

occurs when business records created by a third parties are acquired by law enforcement.[101]

Accordingly, at the time agents in Washington's case were seeking an order authorizing

acquisition of his CSLI data, under the governing law, such an order was constitutional.  Because

the Supreme Court has explained that "searches conducted in objectively reasonable reliance on

binding appellate precedent are not subject to the exclusionary rule,"[102] and the officers in this

case reasonably relied on both the language of the SCA itself along with then-binding appellate

law finding the SCA constitutional, the officers had an objectively reasonable, good-faith belief

their conduct was legal.

  This conclusion is only bolstered by the fact that every Court of Appeals to have

considered the issue has applied the good-faith exception to the acquisition of CSLI data

---

[97] *See In re Application of United States for an Order Directing a Provider of Electronic Communication Service to Disclose Records to Government*, 620 F.3d 304, 319 (3d Cir. 2010); *United States v. Graham*, 824 F.3d 421, 427–428 (4th Cir. 2016) (en banc); *In re Application of the United States for Historical Cell Site Data*, 724 F.3d 600, 614–15 (5th Cir. 2013); *United States v. Carpenter*, 819 F.3d 880, 890 (6th Cir. 2016), *rev'd and remanded*, 138 S. Ct. 2206 (2018); *United States v. Thompson*, 866 F.3d 1149, 1160 (10th Cir. 2017); *United States v. Davis*, 785 F.3d 498, 513 (11th Cir. 2015) (en banc); *see also Carpenter v. United States*, 138 S. Ct. 2206, 2226 (2018) (Kennedy, J., dissenting) (noting that every Court of Appeals to have considered the question found no search occurs when the government obtains cell-cite records from third-party service providers).

[98] *Thompson*, 866 F.3d at 1154.

[99] 425 U.S. 435 (1976).

[100] 442 U.S. 735 (1979).

[101] *See Thompson*, 866 F.3d at 1156 (citing *Miller*, 425 U.S. at 437; *Smith*, 442 U.S. at 743–44).

[102] *Davis*, 564 U.S. at 241.

pursuant to a court order that occurred prior to the *Carpenter* decision.[103]  While the Tenth

Circuit has yet to consider this issue, it seems unlikely it would hold otherwise, especially

because it held prior to *Carpenter* that acquiring historical CSLI data pursuant to a court order

was not a Fourth Amendment search.[104]  Accordingly, the court concludes the good-faith

exception applies to the circumstances surrounding the agents obtaining Washington's CSLI

data, and therefore the data will not be suppressed.[105]

Finally, Washington's argument about the distinction between historical CSLI and real-

time CSLI is unavailing.[106]  As Washington notes in his Memorandum in Support, the *Carpenter*

court only held that the collection of historical CSLI without a warrant is a Fourth Amendment

violation, and did not decide whether collection of real-time CSLI data requires a warrant.[107]

Accordingly, the court would have to expand the holding of *Carpenter* to conclude that any

acquisition of real-time CSLI data requires a warrant.  And even then, Washington would still

have to contend with the United States' good-faith exception argument.  The good-faith

---

[103] *United States v. Zodhiates*, 901 F.3d 137, 143–44 (2d Cir. 2018); *United States v. Goldstein*, 914 F.3d 200, 203 (3d Cir. 2019); *United States v. Chavez*, 894 F.3d 593, 608 (4th Cir. 2018); *United States v. Pritchard*, 964 F.3d 513, 528–29 (6th Cir. 2020); *United States v. Curtis*, 901 F.3d 846, 849 (7th Cir. 2018); *United States v. Korte*, 918 F.3d 750, 758 (9th Cir. 2019); *United States v. Joyner*, 899 F.3d 1199, 1205 (11th Cir. 2018) (per curiam).

[104] *See Thompson*, 866 F.3d at 1160.

[105] The United States further argues in its Opposition that even if the CSLI data relied on in the Affidavit in support of the wiretap were suppressed, the evidence acquired from the wiretap should not be suppressed because even without the CSLI data, there was still ample evidence to support a finding of probable cause.  The United States notes Washington made no showing that statements in the Affidavit related to the CSLI data were material to the probable cause finding, especially given that every deal or attempted deal was either recorded or surveilled by agents.  *See* Memorandum in Opposition at 32–34 (citing *Taylor v. Meacham*, 82 F.3d 1556, 1562 (10th Cir. 1996); *Franks v. Delaware*, 438 U.S. 154, 156 (1978)).  At oral argument, Washington conceded that an argument about the sufficiency of the Affidavit was not properly before the court.  As such, even if the court found suppression of the CSLI data was appropriate, it would not affect the sufficiency of the Affidavit supporting the wiretap, and no evidence gathered as result of the wiretap would be suppressed.

[106] The court assumes for the sake of argument that real-time CSLI data was collected, even though the United States proffered hearing that historical CSLI data was collected.  *See* Memorandum in Opposition at 9.  From Washington's Memorandum in Support, it is unclear at which stage of the investigation real-time CSLI data was collected.

[107] Memorandum in Support at 11.

argument is even stronger where the activity in question has not been determined unconstitutional by the Supreme Court, and, as discussed, the officers acted at the time in reasonable reliance on a statute authorizing such warrantless data collection.  Accordingly, the court does not reach the issue of whether *Carpenter*'s holding should be expanded to real-time CSLI acquisition because the good-faith exception would apply either way.

In short, because the United States has demonstrated the good-faith exception to the warrant requirement applies to its collection of Washington's CSLI data in 2017, Washington's Motion to Suppress the CSLI data and "all evidence derived therefrom" is denied.

### III.   Washington Has Not Met His Burden of Proving the United States Used a Cell-Site Simulator Without a Warrant in Violation of the Fourth Amendment

In his second argument, Washington asserts law enforcement "clearly" used other technology, "likely including active pinging of Washington's phone."[108]  At one point, Washington specifically suggests law enforcement used a cell-site simulator to accomplish this.[109]  Washington argues this "action was being taken on [his] phone" without a warrant, in violation of the Fourth Amendment.[110]  In making this argument, Washington relies on the language of the Affidavit, the testimony of Agent Olson,[111] and the testimony of his expert, Mr. Levitan.[112]  Washington specifically argues the following paragraphs of the Affidavit reveal the agents must have used a cell-site simulator:

---

[108] Memorandum in Support at 15.

[109] *Id.* at 7.

[110] *Id.* at 18–19.

[111] Washington additionally argues that because Agent Olson explained that he was not the primary author of the Affidavit, he did not "have first hand knowledge of many of the facts described" in the Affidavit.  *Id.* at 17.  In Opposition, the United States noted Olson testified the agent who drafted and signed the Affidavit transferred and later began working for a private company, but that Olson assisted in writing the Affidavit.  Memorandum in Opposition at 6 (citing Exhibit 1: First Evidentiary Hearing Transcript at 7:14–8:24).

[112] *See* Memorandum in Support at 15–19.

- Paragraph 16, which states toll phone records were used to identify Washington's phone on July 13, even though the Affidavit also states the Pen Register (which would provide those records) was not obtained until August 2;
- Paragraph 42, which states "ATF was pinging the phone of Berry and Washington. Washington was pinging in the area and Berry was pinging north of the meeting location"; and
- Paragraph 97, which states "[c]ell phone GPS location information has been used on [Washington's] cell phone."[113]

Washington asks that "all evidence associated with Washington's residence and that which followed the use of the unconstitutional tracking, should be suppressed."[114]

In Opposition, the United States argues Agent Olson's testimony "demonstrated the government did not use a cell-site simulator during this investigation," and that Washington only offers conclusory statements from his expert to support a contrary conclusion.[115]  The United States further argues that under the Department of Justice's policy on cell-site simulators, prosecutors are required to obtain a Rule 41 search warrant to obtain and use a cell-site simulator, and so to assert that "the investigators in this case. . . sought pen registers, trap and trace, 2703(d) orders, wiretaps, search warrants, complaints, and arrest warrants, but declined to seek a cell-site simulator search warrant in contravention of DOJ's preexisting policy . . . is wholly false, unpersuasive, and frankly, a tiny bit offensive."[116]

The court agrees with the United States that Washington has failed to offer evidence showing the agents used technology other than what was described in the Affidavit, and therefore has not met his burden of proving a Fourth Amendment violation.  Washington relies on the language of the Affidavit as well as the statements of his expert to assert that "some

---

[113] *Id.* at 15–18 (citing Exhibit B: Wiretap Affidavit ¶¶ 16, 42, 97).

[114] *Id.* at 19.

[115] Memorandum in Opposition at 37.

[116] *Id.* at 37–38.

technology other than mere cell tower location information" was used to track Washington in violation of the Fourth Amendment.[117]  Washington's argument is wholly conclusory and asserts without any evidence other than the conclusions of his expert that agents must have been using some additional technology because of the use of the word "ping" in the Affidavit.[118]  In other words, Washington asks the court to infer certain statements in the Affidavit have specific meaning based only on the conclusory statements of his expert, and asks the court to disregard the sworn testimony of Agent Olson.[119]  This the court will not do.[120]

An example illustrates why Washington's argument is deficient.  The court disagrees that the phrase "Washington was pinging in the area and Berry was pinging north of the meeting area," even in light of the expert's testimony, necessitates the conclusion that law enforcement agents were using some other tracking technology. Washington argues the phrase reveals the agents were using another source of information because, based on the testimony of his expert, "the best location accuracy you could get with solely toll records or Pen Register data, for one sector, would be about 9.4 square miles."[121]  Washington offers the following example to demonstrate his point: "When you consider that Murray[122] is about ten miles from Rose Park,[123] and then make that into square miles, it's easy to see that with CSLI data alone, you could not

---

[117] Memorandum in Support at 15.

[118] *See id.* at 15–19.

[119] Notably, even Washington's expert stated that Olson was credible.  *See* Exhibit 2: Second Evidentiary Hearing Transcript at 58:4–58:5.

[120] During oral argument, the court questioned Washington about this theory, especially insofar as it would require the court to disregard the testimony of Agent Olson.  Washington responded that the court did not need to disbelieve any testimony, but argued that the language in the affidavit "raise[d] a solid question" about the technology uses, especially where Agent Olson said he could not remember certain details of the investigation.  The court notes that "raising a solid question" is not sufficient at the motion to suppress stage—rather, it is Washington's burden to prove that the Fourth Amendment has been violated.  *See Neugin*, 958 F.3d at 930 (citation omitted).

[121] Memorandum in Support at 18.

[122] A suburb about eight miles south of Salt Lake City.

[123] A neighborhood on the west side of Salt Lake City.

say that 'Washington was in the area,' within any normal construction of the phrase, nor much less call this useful information."[124]

Based on Levitan's testimony and the text of the Affidavit alone—the only two pieces of evidence Washington offers—the court cannot conclude other tracking technology was used. The section of the Affidavit which mentions "pinging" describes an unsuccessful attempt at a controlled drug purchase.[125]  The Affiant states the C.I. made recorded phone calls to Washington and one of his associates throughout the attempted purchase, which were "verified via toll records."[126]  The ensuing paragraphs describe the C.I.'s communications with Berry and Washington in detail, while Paragraph 42 only briefly notes that "pinging" revealed Washington was "in the area" of a park in Ogden, Utah where the controlled purchase was meant to occur.[127]  Even according to Levitan's testimony, the phone calls between the C.I. and Washington would register the location of the nearest cell tower to Washington's phone, allowing agents to estimate Washington was in the same 9.4-square-mile sector as the controlled purchase location.[128]  That fact on its own is sufficient to support the statement "pinging in the area," especially because the Affidavit does not state Washington was at the park precisely, or indeed, give any detailed information about Washington's location during this controlled buy.  This section of the Affidavit also notes the C.I. was equipped with a transmitting and recording device, and agents were sent to the park for surveillance.[129]  The Affidavit therefore does not provide evidence that the phrase "Washington was pinging in the area" compels the conclusion, let alone the "only

---

[124] *Id.*

[125] *See* Exhibit B: Wiretap Affidavit ¶¶ 38–46.

[126] *Id.* ¶¶ 39, 40, 43, 44, 46.

[127] *Id.* ¶¶ 39, 40, 42, 43, 44, 46.

[128] Exhibit 2: Second Evidentiary Hearing Transcript 53:1–54:3.

[129] Exhibit B: Wiretap Affidavit ¶ 41.

possible conclusion," that agents were using other technology in their attempt to set up and surveil the controlled buy.[130]  Rather, the Affidavit means exactly what it says: the C.I. placed calls to Washington's phone, when Washington answered those calls agents were able to track Washington's location in relation to a nearby cell tower, and based on the cell tower location data the agents could infer Washington was "pinging in the area" of the Ogden park.

In conclusion, Washington has failed to meet his burden of proving that the Fourth Amendment was implicated because he fails to prove the prerequisite facts he alleges—namely, that more sophisticated location-tracking technology was used without a warrant.  Because Washington has not met his burden of proof, Washington's motion to suppress the "evidence associated with Washington's residence, and that which followed the use of the constitutional tracking," is denied.

## CONCLUSION

For the reasons stated above, Washington's Motion to Suppress[131] is DENIED.

SO ORDERED this 24th day of March, 2022.

BY THE COURT:

_____
ROBERT J. SHELBY
United States Chief District Judge

---

[130] Similarly, the part of the Affidavit that states "cell phone GPS location information has been used on Washington and Berry's cell phone" also notes the information has been "used in conjunction with physical surveillance," and "lacks any contextual information without the requested interceptions to show of these movements are linked to criminal activity."  *Id.* ¶ 97.  Accordingly, the Affiant's statement tracks with Agent Olson's testimony that pen register data and toll records were used to track Washington's movements using cell towers, but not with any precision.

[131] Dkt. 121.